USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED:

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

Original

PRO SE OFFICE

JS

|  |  |  |
|---|---|---|
| MARGARITA T. WALTER, | : | CIVIL CASE NO. 10 CIV 8722 |
| Plaintiff, | : |  |
|  | : | *CIVIL ACTION* |
|  | : |  |
| The State of New York, | : | **AMENDED COMPLAINT AND** |
|  | : | **JURY DEMAND** |
| Defendant. | : |  |

COMES NOW, the Plaintiff, Margarita T. Walter (herein "Plaintiff"), without the assistance of an attorney, and a qualified litigant as defined by the Americans with Disabilities Act Amendments Act (herein "ADAAA"), and files this, her Amended Complaint and Jury Demand. In support thereof would show the Court the following:

## PRELIMINARY STATEMENT OF THE CASE

1. The Plaintiff, Margarita T. Walter, is currently being fraudulently REMOVED from the marital home due to a well-strategized plan. This first took her three disabled minor children by a misleading emergency ex parte application over four years ago away from any contact with the Plaintiff despite that she has no felony convictions and non incarcerated. The marital home is next.

2. The proceedings that have been held by the Courts in order to come to this conclusion have been held without Plaintiff Walter having participatory or testimonial access in accordance to Federal regulations under the ADAAA 42 USC 12101 *et seq*.


RECEIVED
JUL 06 2011
PRO SE OFFICE

3.  Plaintiff seeks injunctive relief so that she may be able to function throughout litigation and defend herself against false accusations against her abusive, monied spouse, John Walter. These acts were performed knowingly, intentionally, and negligently. She was egregiously damaged personally, financially, and emotionally.

## PARTIES/STATE ACTORS:

4.  Plaintiff Margarita T. Walter is a resident of Westchester County, New York and a citizen of the United States.

5.  Defendant State of New York is the responsible entity for employing, training and regulating State Actors. This includes conduct that is required by the Administration Office of the Unified Court System when meting out accommodations and qualifying individuals under the ADAAA.

## JURISDICTION & VENUE

6.  This Court is vested with jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343(3) and (4), and the First, Fifth, and Fourteenth Amendments to the United States Constitution. Pendant jurisdiction over Plaintiff's state law claims is proper pursuant to 28 U.S.C. § 1367, a codification of the Supreme Court's rulings on ancillary jurisdiction. Venue is proper under 28 USC § 1391(b) as the causes of action arose in the Southern District of New York, and the events, actions, omissions occurred within this judicial district.

7.  Additionally, this Honorable Court has subject-matter jurisdiction over these claims seeking relief from family-court orders, which emanated under procedures that violated due process, equal protection, and other Federal statutes such as the ADAAA. *See Agg v. Flanagan*, 855 F.2d 336, 339 (C.A.6 (Ohio) 1988) and U.S. Constitution Article 6, cl. 2; and Amendments 5, 14.

2

8. Plaintiff contends that domestic-relations exception does not apply to ADAAA civil rights suits that raise Constitutional questions and seek damages for the deprivation of Plaintiffs Constitutional interests without due process of law, *Rubin v. Smith*, 817 F.Supp. 987, 991 (D.N.H. 1993). *Friedlander v. Friedlander*, 149 F.3d 73, 740 (C.A.7 (Ill.) 1998. Despite the action merely arises from a domestic-relations dispute, Plaintiff does not seek any of the distinctive forms of relief typically associated with domestic-relations jurisdiction, as this suit is also for interference with custody by way of discrimination. *Lloyd v. Loeffler,* 694 F.2d 489 (7th Cir.1982).

9. The domestic-relations exception has no generally recognized application as a limitation on Federal question jurisdiction; it applies only as a judicially implied limitation on diversity jurisdiction, *U.S. v. Johnson*, 114 F.3d 476 (C.A.4 (Va.) 1997).

10. The federal court is to decide not who should have custody of the two children currently under 18 years old but only whether the Plaintiff has been violated under Civil and Constitutional Rights without equal access to the Court systems while attempting to litigate issues surrounding the children. The resolution of these issues requires no special experience with the business of domestic relations courts; the requisite empathy, if any is required, is possessed by any parent *McIntyre v. McIntyre,* 771 F.2d 1316 (9th Cir. 1985) (similar to Lloyd); *DiRuggiero v. Rodgers,* 743 F.2d 1009, 1018-20 (3d Cir.1984) (similar to Lloyd); *Stone v. Wall,* 135 F.3d 1438 (11th Cir. (Fla.) 1998) (similar to Lloyd).

11. The Plaintiff has exhausted all of her state remedies and is turning to this Honorable Court to really listen to the claims here within[1].

---

[1] NYS Court of Appeals Margarita T. Walter v John Walter motion#2010 00544, decided 6-8-10, dismissed action not within the meaning of the Constitution; Margarita T. Walter v John Walter #2010 00523 decided on 6-8-10 dismissed action as untimely; Bender Jenson Silverstein, LLP v Margarita T. Walter # 2010-00108 decided on April 1, 2010 dismissed action as not within the meaning of the Constitution; Margarita Walter vs Jones Sledzik Garneau

## FACTUAL BACKGROUND

12. This instant litigation has arisen from multiple violations of Constitutional and Civil rights in the domestic relations case of *Walter v. Walter*. Moreover the Plaintiff contends that the purported Judgment of Divorce issued May 5, 2005 was and is void for said violations, which rises to the level of denying Due process and equal protection to the Plaintiff. *See Catz v. Chalker*, 142 F.3d 279 (C.A.6 (Ohio) 1998.

13.   The Plaintiff, Margarita T. Walter, is currently being forced to vacate from the marital home at 30 Lakeview Drive Yorktown Heights New York 10598 (hereinafter subject property), by Order and Judgment dated June 2, 2011 signed by Acting Supreme Court Judge Robert Neary[2] (hereinafter OJ) that is  based on substantive modification to an alleged Judgment of Divorce[3] dated May 2005. The consequence of the OJ leaves Plaintiff, homeless, penniless and without access to her children devoid of Due Process and equal protection of law. Said OJ requires Plaintiff's removal by June 17, 2011[4] from her home jointly owned with her monied spouse, John Walter, the Defendant in the underlying matrimonial action in the Westchester County Supreme Court Index number 17328/01.

14.   The exigency of the Preliminary Injunction is to Mandate a Stay from execution of the terms of the aforementioned OJ as it was issued without the Plaintiff's involvement and presence due to not having or minimally having participatory or testimonial access to related hearing(s) against ADA and ADAAA law therefore, denying Plaintiff Due Process and equal protection of law.

---

& Nardone (aka Jones & Garneau) 2009-01400 decided on April 1, 2010 denied action as not within the meaning of the Constitution.
[2] The OJ was procured as a default judgment, a well settled violation to
New York state public policy. The OJ was procured from a court that knowingly has aided and abetted material conflicts of interests
[3] John Walter is the Defendant in NYS Supreme Court Index # 17328/01
[4] Notice of Removal from the Westchester County Sheriff's Office dated June 29, 2011 requires Plaintiff's to vacate by July 11, 2011 10:00am.

4

15.   Plaintiff is requesting a Temporary Restraining Order and/or a Preliminary Injunction to Prohibit the Sheriff of Westchester County or other authority to proceed with Plaintiff's removal from the "subject property" (marital home at 30 Lakeview Drive Yorktown Heights New York 10598) now scheduled for July 11, 2011 at 10:00AM, see NOTICE OF REMOVAL, stemming from a matrimonial action in the Westchester County Supreme Court[5].

16.   Respectfully, this Court should know that Plaintiff cannot secure regular employment because of her disabilities that interfere with her daily activities; therefore, she has no source of income. She borrows money from friends and family to subsist and has no control over those funds. Notably, she borrowed to pay the filing fee for this application.  She requests this Court to recognize her plummeting financial crisis and now she is about to be removed from the marital home on July 11, 2011 due to foreclosure at the hands of monied spouse, John Walter.[6] This will result in the Plaintiff being homeless and further become a public charge.

17.   In extensive evidentiary hearings held, on September 28, October 3 and on October 10, 2006 in the New York **Supreme Court** (Westchester County), on October 10, 2006 it was confirmed by ruling of the Honorable John La Cava that the Plaintiff would hold primary custodianship of the three children and would continue to reside at the subject property by modification to the purported Judgment of Divorce[7] to extend maintenance payments to Plaintiff

---

[5] This case at bar arises from the related matrimonial action case Index # 17328/01 Plaintiff commenced in October 2001, that ensued and in October of 2006, after a ruling on October 10, 2006 by Supreme Court Judge John La Cava to financially obligate the Plaintiff's monied spouse John Walter, (Defendant in said action) to maintain the status quo of the household and ensure Plaintiff, as primary custodian and Mother of her three biological children to continue to reside in the marital residence in Somers, NY, where the children were raised throughout their lives. That a few days later the result has been a de facto termination of parental rights by not allowing Plaintiff to see her children in nearly five (5) years without a full and fair hearing.

[6] Was Court Ordered on October 10, 2006 by Westchester County Supreme Court to continue payments and then extended on March 20, 2007 by the Appellate Division Second Department.

[7] Plaintiff objected to purported Judgment of divorce was not duly signed by a judge, was procured from lack of subject matter jurisdiction, fraud upon the court and other improprieties.

for six months. John Walter was ordered to continue spousal support that dollar for dollar went to pay the two mortgages on the home that had been assigned to the Plaintiff as liabilities. This ruling was based upon extensive motion practice from June 2006 and resulting from full and fair hearings in which John Walter argued that the Plaintiff was capable of being gainfully employed and care for the daily needs of the three children and the marital home.

18.    The instant case at hand is an offshoot of the earlier action in 2006. Prior to the Supreme Court's additional award of spousal maintenance, the question of custody or of Plaintiff's suitability as primary custodian had never arisen. As it transpired, on October 14, 2006, four days after Judge La Cava's decision extending John Walter's obligation to make spousal payments, the events in controversy took place. John Walter removed the children from the residence and from the non-monied spouse, Plaintiff, Mother's custody and made a successful ex parte application for temporary custody and a temporary "stay-away" order de facto that is unlawfully in place today without evidentiary hearings showing the totality of the circumstances as required by Due Process of law and her fundamental interests as a parent and of her property rights as guaranteed under the U.S. Constitution

19.    The contrived scheme was due to a well-strategized plan by her abusive monied spouse, John Walter[8] by way of perpetrating frauds upon the Courts of the State of New York reporting on October 17, 2006 at a different court, Family Court in Westchester County that the Plaintiff was an unfit parent.

20.    Not to mention that the whole matter of an "unanticipated change of circumstances" should be moot as fraud upon the court as John Walter had filed an Order to Show Cause on October 19, 2006 in Supreme Court for Plaintiff to vacate the subject property, just over a week after the Hon. John La Cava on October 10, 2006 ruled that Plaintiff stay in the said property

---

[8] Defendant in Westchester County Supreme Court Index # 17328/01

with the children and continue the financial obligation to her.

21.   In a hearing held, on October 10, 2006 in the New York **Supreme Court** (Westchester County), it was confirmed that the Plaintiff would hold primary custodianship of the children and stay at the marital home. John Walter was ordered to continue spousal support that dollar for dollar when to pay the two mortgages on the home that had been assigned to the Plaintiff as liabilities. This ruling was based upon extensive evidentiary hearings in which John Walter argued that the Plaintiff was capable of being gainfully employed and still care for the children and the home.

22.   On October 17, 2006, John Walter filed a misleading emergency ex parte application in **Family Court, a different court from the ruling affirming Plaintiff's primary custodianship from Supreme Court on October 10, 2006** in which he was contradictorily awarded temporary transfer of the children, which has been extended and continued to date. After his argument on before Hon. La Cava aforementioned that the Plaintiff was fit, just a few days later he stated the OPPOSITE in Family Court. John Walter reported that the Plaintiff was so unfit she cannot even have phone contact with the children. Therefore, the Plaintiff has not seen or spoke to her children since and has been blocked from defending herself in a FAIR and NEUTRAL court. Despite material conflicts of interests among the attorneys, on October 31, 2006 a stay away order requested by the attorneys was granted de facto an a temporary transfer of custody.

23.   The contrived scheme was due to a well-strategized plan by her abusive monied spouse, John Walter[9] by way of perpetrating frauds upon the Courts of the State of New York reporting on October 17, 2006 at a different court, Family Court in Westchester County that the Plaintiff was an unfit parent.

---

24.  Not to mention that the whole matter of an "unanticipated change of circumstances" should be moot as fraud upon the court as John Walter had filed an Order to Show Cause on October 19, 2006 in Supreme Court for Plaintiff to vacate the marital residence, just over a week after the Hon. John La Cava on October 10, 2006 ruled that Plaintiff stay in the said property with the children and continue the financial obligation to her. The October 10, 2006 rulings by Supreme Court Judge La Cava were are now being overturned by a purported "unanticipated change of circumstances" without Due Process and equal protection being followed by John Walter and his attorney's of record versus a known disabled, non monied and self represented individual.

25.  John Walter owes substantial retroactive child support due since the commencement of the initial divorce action in 2001 and on March 20, 2007 was ordered to pay Plaintiff by the Appellate Division Second Department but is still unpaid.

26.  Plaintiff sought ADAAA accommodations from the Westchester County Supreme Court by reports filed in 2008, 2010, with no response given and in 2011, which were simply summarily denied. There was no formal denial in writing with other proposed alternative accommodations as mandated by Federal law.

27.  February 2008, Plaintiff was diagnosed with Complex Post Traumatic Stress Disorder, Stress Disorder, Anxiety and Depression (PTSD). Any other disabilities shall not be disclosed per HIPAA regulations as well as according to the standards rejected and clarified by the ADAAA in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184 (2002), 224 F.3d 840 (the primary object of attention in ADA cases is whether the entity has complied with its obligations and **"the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."**) **[emphasis added]** Diagnosis was first

made and related to the Court in 2008. One disability is sufficient for reasonable accommodations under the ADAAA. Plaintiff has made numerous applications to all the NYS courts she has had litigations in, stating that she has disabilities before each respective Judge. Therefore, the Plaintiff met "the essential eligibility requirements for the receipt of services or the participation in her proceeding." 28 C.F.R. § 35.104.

28.    In a report prepared by Dr. Huffer (a nationally recognized ADAAA Title II and III Specialist) communicating with Plaintiff's local Dr. Singleton, stated, "When legally established systems are used to create or further the trauma it is then called *Legal Abuse Syndrome* (Huffer, 1995). The actual diagnosis is Post Traumatic Stress Disorder (PTSD).  PTSD/LAS is a psychobiosociolegal problem that arouses certain physiological changes in the PTSD sufferer."

29.    The report states, "[Plaintiff] [M]argarita Walter demonstrates goal orientation, severe stress, and shock as to her reality.  She remains stunned and puzzled as to her loss of custody and the purposeful, planned and executed destruction of her parenthood and her very ability to exist. Without a fair hearing on the subject, she has lost her children, nearly all marital assets, and is blocked and abused by the very system she counted on to protect her rights."

30.    April 21, 2008, Plaintiff contacted Donna Minort under the direction of Nancy Mangold, as the proper access coordinator for ADA accommodations in the Westchester County Supreme Court, sent her the report and met with her. June 24, 2008 Plaintiff again contacted Nancy Mangold by letter to again obtain further direction for the ADA accommodations. Ms. Mangold directed her to Ms. Minort who claimed she did not handle said requests for accommodations and Ms. Minort turned over said report to Tommie Berg, Administrative Assistant to former Administrative Judge Francis Nicolai.

31.   Ms. Berg on or around April 2008 was erratic in that she indicated she had no time to discuss Plaintiff's accommodations, and she did not believe she had disabilities in accordance to ADA. The Plaintiff had included two letters from medical doctors. After numerous phone messages for Ms. Mangold, no action was taken by anyone in the OCA and the Plaintiff gave up and lost hope.

32.   Plaintiff is in serial legal processes where she is denied the most basic of human rights to due process of law by the Administration refusing to respond to her requests for accommodating her disabilities to offset their destructive effects on her ability to participate in her Court.

33.   Plaintiff's conditions are invisible so they are easy to overlook.  However, access to the court is denied just the same as if she needed a wheelchair and was denied ramp and elevator access.  This situation must be remedied by an immediate approval of her reasonable accommodations requested.   If the ADA Administration does not approve certain accommodations then a written denial must be provided so Plaintiff can exercise her right to file a grievance, an appeal, or a complaint with the Department of Justice.

34.   For more than three years qualified Doctors as well as ADA Specialists and Forensic Psychologists have assisted Plaintiff by evaluating her, communicating with her licensed physician and psychotherapist in New York.  Reasonable and appropriate accommodations have been designed for her and have attempted to elicit a response from the ADA Access Coordinators for her Court.  As of this date Plaintiff has not received a response to the requests and is not granted reasonable accommodations during her hearings.

35.   The following is excerpted from the last communication of March 2011 as a general letter for Plaintiff to provide to ADA Administration that was created as an open letter to anyone

in authority who might help in an effort to assist Plaintiff:

> *I {Dr. Karin Huffer} am authorized to communicate with Ms Walter's Therapist, Patricia Singleton, Ph.D., on an ongoing basis. We concur that as a direct and proximate result of the failure of the ADA Administration of the Court to accommodate this person with disabilities, Ms. Walter's condition is deteriorating. The stress of litigation without accommodations is affecting Ms. Walter's condition making this litigation experience more a war of attrition than litigation.*
>
> *Ms. Walter's conditions are invisible so they are easy to overlook. However, access to the court is denied just the same as if she needed a wheelchair and was denied ramp and elevator access. This situation must be remedied by an immediate approval of her reasonable accommodations requested. If the ADA Administration does not approve certain accommodations then a written denial must be provided so Ms. Walter can exercise her right to file a grievance, an appeal, or a complaint with the Department of Justice.*
>
> *Ms. Walter suffers from Post Traumatic Stress Disorder, Anxiety and Depression. She needs the following reasonable accommodations in order to have a level playing field*

(a)     Ms. Walter needs an advocate with her at all times during all hearings, meetings, legal activities in order to accommodate when she is symptomatic. Ms. Walter cannot concentrate, receive information, form spoken responses at those times. The advocate indexesinstituted to apply for approval of accommodations during litigation has proven to be prohibitive for Plaintiff when she is symptomatic. This is an inadvertent discrimination put upon the individual with disabilities that must be brought to the attention of the ADA Administration Office, organizes, supports Ms. Walter, and speaks her words for her when she cannot.

(b)     Ms. Water needs a digital tape recorder to accommodate amnesic symptoms of PTSD.

(c)     Ms. Walter needs to be allowed telephonic appearances whenever possible.

(d)     Ms. Walter needs extended deadlines, and may need continuances if symptomatic. She cannot deal with mail, legal papers, or research without flashbacks preventing her from staying on task.

(e)     Ms. Walter needs to take breaks when she becomes symptomatic during litigation.

(f)     Ms. Walter needs misinformation corrected on the record. Misinformation

has been used to force her to become symptomatic in order to exploit her symptoms in Court. This information is apart from the sentinel issues in the case; they are used merely to discriminate against a litigant with disabilities. A simple Data Analysis Sheet will be prepared to provide to the Trier of Fact for each critical misstatement made to the court with factual evidence

36. Throughout the litigation several Attorney's for both parties participated in acts including but not limited to violation to conflicts of interest, unethical misconduct, coercion, illegal ex parte communications, false and excessive billing, and pre determined outcomes of various judicial rulings all of which deprived Plaintiff of fundamental rights, due process and property rights.

37. Throughout these litigations, Plaintiff was before numerous Judges, which convoluted already muddied water.

38. Throughout these litigations, the Plaintiff had no participatory or testimonial access to the Court system as she had no accommodations under the ADAAA despite her numerous requests for such.

39. In February of 2007 (the late) Stahl Esq and John Walter petitioned the Supreme Court and were granted by Acting Supervising Supreme Court Judge Scarpino of the Matrimonial Part, a transfer of the custodial issues from Westchester County Family Court to be consolidated with the correlated financial issues. The consolidated matter was referred to Judge Martin; later in October 2009 it was then referred to Supreme Court Judge Linda Jamieson without any confirmation of assignment around January 2010. Plaintiff finally learned that Judge Jamieson was not presiding in Westchester County, so she implored to Administrative Judge Alan Scheinkman of the Ninth Judicial District to advise who was handling this matter. Next, she was referred to Supreme Court Judge Francesca Connolly, who rendered a decision and order September 14, 2010 that addressed issues and outstanding motions filed since December 2006

and deferred pertinent trials on custody and finances, until recently in January 2011 the matter was now referred to acting Judge Neary.

40.    Throughout these litigations the Plaintiff's unalienable right to parent has simply been taken from her. On October 10, 2006 Plaintiff was ruled fit and was awarded custody of the children. One week later John Walter petitioned a different Court with a false emergency ex parte order and won temporary custody of the children ever since. The Plaintiff has not seen her children or been allowed to defend herself in Court against his false allegations.

41.    For example, on December 20, 2001, Plaintiff, as the non monied spouse and primary custodian of three young children, was defrauded by Ludman, Bender, the late Stahl, John Walter and Shapiro into a stipulation on finances that had no stated dollar amount for financial support. Plaintiff relied upon the stipulation, but subsequently learned said stipulation was in violation to General Obligations law, public policy and due process. By her ex-spouse knowing the Plaintiff's disabilities and therefore related "triggers" he used this knowledge to further manipulate her post divorce now using the Court system as a weapon to further harm her.

42.    Specifically, Shapiro exhibited abuse of discretion by allowing a legally flawed stipulation that caused significant financial and emotional harm to Plaintiff and her children by not having sufficient support to cover the necessities in compliance to the Domestic Relation Law. The imbalance of power by monied spouse John Walter has denied Plaintiff her rights to equal protection, all of which was permitted and ratified by state actors.

43.    The aforementioned people had knowledge of the Plaintiff's disability and saw this as an opportunity to take advantage of such.

44.    Presently, Foreclosure proceedings have commenced as per the Wells Fargo letter dated February 3, 2011.  The two mortgages against the marital home, the primary and the home equity

line of credit, are both held with Wells Fargo.  Unfortunately, the foreclosure process is in effect. Unequivocally, in light of the updated appraisal and the foreclosure status, there is no accessible equity in the marital home. "Unless litigants are given a meaningful opportunity to be heard in certain Courts as the means to redress the question of fair consideration of the lower courts, there will be no due process." "Whenever one is assailed in their personal property, she may defend" *Windsor v McVeigh*, 93 U.S. 274, 277.

## FIRST COUNT

### (Violations of Civil Rights; Discrimination due to Disability, Pro Se status, non monied spouse and Whistle blowing)

45.    Plaintiff is a member of at least four distinct, discernible, and identifiable "classes". She is a Non-criminal /Non-incarcerated Matrimonial and Family and civil court litigant, within the State of New York. She is a Non-monied spouse; a Whistleblower of New York State Court corruption matters. Moreover, she is a qualified litigant under Title II of the ADAAA.

46.    Congress enacted the ADA, 42 U.S.C. 12101 *et seq.*, to establish a "comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. 12101(b)(1). Congress found that "historically, society has tended to isolate and segregate individuals with disabilities," and that "such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. 12101(a)(2). Discrimination against persons with disabilities "persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." 42 U.S.C. 12101(a)(3). In addition, persons with disabilities

> "[C]ontinually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make

> modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities."

42 U.S.C. 12101(a)(5).

47.   Furthermore, "people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally." 42 U.S.C. 12101(a)(6). "[t]he continuing existence of unfair and unnecessary discrimination and prejudice," Congress concluded, "[d]enies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous." 42 U.S.C. 12101(a)(9). In short, Congress found that persons with disabilities have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society. 42 U.S.C. 12101(a)(7).

48.   Based on those findings, Congress "invoke[d] the sweep of congressional authority, including the power to enforce the fourteenth amendment" as authority for its passage of the ADA. 42 U.S.C. 12101(b)(4).

49.   Title II of the **ADA** and Section 504 of the Rehabilitation Act provide that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The statute defines the term "qualified individual with a disability" as "an individual with a disability who, with or without …the provision of auxiliary aids and services, meets the essential eligibility requirements

for the receipt of services or the participation in programs or activities provided by a public

entity." See 42 U.S.C. § 12131(2).

50.   "Auxiliary aids and services" are defined as including a wide range of methods to

provide effective communication with people who have PTSD.  The **ADA** lists as examples of

auxiliary aids and services, "needs an advocate with her at all times during all hearings,

meetings, legal activities in order to accommodate when she is symptomatic and/or a digital tape

recorder to accommodate amnesic symptoms of PTSD, or other effective methods of making

aurally delivered materials available to individuals with PTSD impairments," 42 U.S.C. §

12102(1)(A); See 28 C.F.R. § 35.104. The ADA implementing regulation imposes on a public

entity the duty to provide appropriate auxiliary aids.  28 C.F.R. § 35.160.

51.   Under the ADA and ADAAA, the Court must accommodate disabled litigants under

Title II, which concerns public facilities serving the public. The Court system falls into this

category. Title III, addresses private business serving the public, and all lawyers fall into this

category. Regardless, no person as a matter of law shall be discriminated on the basis of race,

national origin, religion, age, sex, or disability. 42 U.S.C. § 2000 Department of Justice

regulations provide that, except for new construction and alterations, public entities need not take

any steps that would "result in a fundamental alteration in the nature of a service, program, or

activity or in undue financial and administrative burdens." 28 C.F.R.v35.150(a)(3); see also 28

C.F.R. 35.130(b)(7), 35.164; *Olmstead v. L.C.*, 527 U.S.v581, 606 n.16 (1999). Title II may be

enforced through private suits against public entities. 42 U.S.C. 12133. Congress expressly

abrogated the States' Eleventh Amendment immunity to private suits in federal court. 42 U.S.C.

12202.

52.   The Supreme Court in *University of Alabama v. Garrett*, 531 U.S. 356 (2001),

reaffirmed that Congress had the power to abrogate States' Eleventh Amendment immunity to

private damage actions under Section 5 of the Fourteenth Amendment, which authorizes

Congress to enact "appropriate legislation" to "enforce" the rights protected by Section 1 of the

Fourteenth Amendment. *Garrett* held that Congress's abrogation for Title I of the ADA was not

"appropriate" because Congress had only identified six examples of potentially unconstitutional

discrimination by States against people with disabilities in employment and there was no

evidence that Congress had made a legislative judgment that such discrimination by States was

pervasive. The record before Congress of constitutional violations in employment did not

provide a sufficient basis for Congress to abrogate immunity for a statutory scheme that was

designed to remedy and deter constitutional violations.

53.   In contrast, the record before Congress supported Congress's decision to abrogate

**Eleventh Amendment immunity for Title II**. Congress assembled a record of constitutional

violations by States – violations not only of the Equal Protection Clause but also of the full

spectrum of constitutional rights the Fourteenth Amendment incorporates – which Congress in

its findings determined "persist[ed]" in areas controlled exclusively or predominantly by States,

such as education, voting, institutionalization, and public services. These well-supported findings

justify the tailored remedial scheme embodied in Title II. Congress formulated a statute that is

carefully designed to root out present instances of unconstitutional discrimination, to undo the

effects of past discrimination, and to prevent future unconstitutional treatment by prohibiting

discrimination and promoting integration where reasonable. At the same time, Title II preserves

the latitude and flexibility States legitimately require in the administration of their programs and

services. Title II accomplishes those objectives by requiring States to afford persons with

disabilities genuinely equal access to services and programs, while at the same time confining the statute's protections to "qualified individual[s]," who by definition meet all of the States' legitimate and essential eligibility requirements. Title II simply requires "reasonable" modifications that do not impose an undue burden and do not fundamentally alter the nature or character of the governmental program. **The statute is thus carefully tailored to prohibit only state conduct that presents a substantial risk of violating the Constitution or that unreasonably perpetuates the exclusionary effects of the prior irrational governmental segregation of persons with disabilities.**

54.   The Supreme Court specifically reserved the question that the district court addressed, whether Title II's abrogation can be upheld as valid Section 5 legislation. The Supreme Court noted that Title II "has somewhat different remedial provisions from Title I," id. at 360 n.1, and that the legislative record for those activities governed by Title II was more extensive, see id. at 372 n.7. Less than a week after deciding Garrett, the Supreme Court denied a petition for certiorari filed by California and let stand the Ninth Circuit's holding that Title II's abrogation was valid Section 5 legislation. See *Dare v. California*, 191 F.3d 1167 (1999), cert. denied, 121 S. Ct. 1187 (2001).

55.   As the Court's disposition of *Dare* indicates, Garrett does not imply that Title II's abrogation exceeds Congress's power under Section 5. For Title II differs from Title I.

56.   Title II governs all the operations of a State, which plainly encompasses state conduct subject to a number of other constitutional limitations embodied in the First, Fourth, Fifth, and Eighth Amendments and incorporated and applied to the States through the Fourteenth Amendment. Those rights include the right to vote, to access the courts, to petition officials for redress of grievances, to receive due process, and to be confined where conditions are humane.

To the extent that Title II enforces the Fourteenth Amendment by remedying and preventing government conduct that burdens these constitutional provisions and discriminates against persons with disabilities in their exercise of these rights, Congress did not need to identify irrational government action in order to identify and address unconstitutional government action. See *Popovich v. Cuyahoga County Court of Common Pleas*, 276 F.3d 808, 813-814 (6th Cir. 2002) (en banc); id. at 820 (Moore, J., concurring) ("The fact that Title II implicates constitutional violations in areas ranging from education to voting also suggests that heightened judicial scrutiny under both the Due Process and Equal Protection Clauses is appropriate.")

57.    Congress engaged in extensive study and fact-finding concerning the problem of unconstitutional discrimination against persons with disabilities, holding 13 hearings devoted specifically to the consideration of the ADA. In addition, a congressionally designated Task Force held 63 public forums across the country, which was attended by more than 7,000 individuals. Task Force on the Rights and Empowerment of Americans with Disabilities, *From ADA to Empowerment 18* (1990) (Task Force Report). The Task Force also presented to Congress evidence submitted by nearly 5,000 individuals documenting the problems with discrimination faced daily by persons with disabilities – often at the hands of state governments. See *2 Staff of the House Comm. on Educ. and Labor*, 101st Cong., 2d Sess., Legis. Hist. of Pub. L. No. 101-336: *The Americans with Disabilities Act*, 100th Cong., 2d Sess. 1040 (Comm. Print 1990) (Leg. Hist.); *Task Force Report 16*. Congress also considered several reports and surveys. See *S. Rep.* No. 116, 101st Cong., 1st Sess. 6 (1989*); H.R. Rep.* No. 485, Pt. 2, 101st Cong., 2d Sess. 28 (1990); *Task Force Report* 16.

58.    Therefore, as a matter of law, this litigant must be provided with said services. 42 U.S.C. § 12131(2):

"To prevail on a claim for violation of Title II of the ADA, the Plaintiff must show (1) that she is a qualified individual with a disability; (2) that she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits or discrimination was by reason of the Plaintiff's disability." *Douris v. Dougherty*, 192 F. Supp. 2d 358, 368 (E.D. Pa. 2002) (citations omitted).

Plaintiff has met all of the above requirements, establishing a prima facie case under the ADA.

59.  **Historic Discrimination**: The "propriety of any § 5 legislation 'must be judged with reference to the historical experience . . . it reflects.'" *Florida Prepaid Postsec. Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 640 (1999). Congress and the Supreme Court have long acknowledged the Nation's "history of unfair and often grotesque mistreatment" of persons with disabilities. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 454 (1985) (Stevens, J., concurring); see id. at 461 (Marshall, J., concurring in the judgment in part); see also Olmstead v. L.C., 527 U.S. 581, 608 (Kennedy, J., concurring) ("[O]f course, persons with mental disabilities have been subject to historic mistreatment, indifference, and hostility."); *Alexander v. Choate*, 469 U.S. 287, 295 n.12 (1985) ("well-cataloged instances of invidious discrimination against the handicapped do exist").

60.  That "lengthy and tragic history," *Cleburne*, 473 U.S. at 461 (Marshall, J.), of discrimination, segregation, and denial of basic civil and constitutional rights for persons with disabilities assumed an especially pernicious form in the early 1900s, when the eugenics movement and Social Darwinism labeled persons with mental and physical disabilities "a menace to society and civilization . . . responsible in a large degree for many, if not all, of our social problems." Id. at 462 Marshall, J.; see also *Civil Rights Comm'n, Accommodating the Spectrum of Individual Abilities* 19 (1983) (Spectrum). Persons with disabilities were portrayed as "sub-human creatures" and "waste products" responsible for poverty and crime. Spectrum 20.

"A regime of state-mandated segregation and degradation soon emerged that in its virulence and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow." *Cleburne*, 473 U.S. at 462 (Marshall, J.). Every single State, by law, provided for the segregation of persons with mental disabilities.

61.   **The Enduring Legacy of Governmental Discrimination:** "Prejudice, once let loose, is not easily cabined." *Cleburne*, 473 U.S. at 464 (Marshall, J.). "[o]utdated statutes are still on the books, and irrational fears or ignorance, traceable to the prolonged social and cultural isolation" of those with disabilities "continue to stymie recognition of the[ir] dignity and individuality." *Id.* at 467 (emphasis added). Consequently, "our society is still infected by the ancient, now almost subconscious assumption that people with disabilities are less than fully human and therefore are not fully eligible for the opportunities, services, and support systems which are available to other people as a matter of right. The result is massive, society-wide discrimination." *S. Rep.* No. 116, supra, at 8-9.

62.   In particular, **Congress reasonably discerned a substantial risk that persons with disabilities will be subjected to unconstitutional discrimination by state governments in the form of "arbitrary or irrational" distinctions and exclusions**, *Cleburne*, 473 U.S. at 446.

63.   Each request made by the Plaintiff is within the discretion of the court, can be provided equally to all litigants, and is not a burden to court personnel and will not cost the court any money. Yet even if the requests were found to "not be reasonable" such denial should clearly be outlined in writing and a compromise solution offered. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that, "no state shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

64.   In *L.C. v. Olmstead*, 138 F.3d 1485 (11th Cir. 1998), the Supreme Court held,

"[T]he states' need to maintain a range of facilities for the care and treatment of individuals with diverse mental disabilities must be recognized. In determining whether a state can successfully assert a "fundamental alteration" defense (i.e., claim that providing community-based services to an individual would fundamentally alter the state's service-delivery system), courts must consider not only the cost of providing community-based care to the litigants, but also the state's obligation to mete out services to others with mental disabilities in an equitable manner." [emphasis added]

65. The *Olmstead* decision should encourage states to begin planning implementation strategies to comply with the ADAAA's integration mandate, spelled out in regulations requiring that services be provided "in the most integrated setting appropriate to the needs" of people with mental or physical disabilities.

66. Section 504 of the Rehabilitation Act bans public agencies that receive Federal funds from discriminating based on disability. The Courts are a public agency that receives Federal funds, therefore is responsible for the employment of Defendant Judge(s).

67. The ADAAA explicitly rejected the Supreme Court's definition of "substantially limits," in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), 224 F.3d 840, and clarified its intention that the primary object of attention in ADA cases is whether the entity has complied with its obligations and "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." [emphasis added]

68. In the landmark case *Tennessee v. Lane et al.*, 541 U.S. 509 (2004), established that States are protected from suit in Federal Court under the Eleventh Amendment's Sovereign Immunity Doctrine. Yet the court found that, "[w]hile Congress may not have had enough evidence of disability discrimination to waive sovereign immunity for equal protection claims, it did have enough evidence of due process violations (such as non-handicap-accessible courthouses) to waive the sovereign immunity doctrine for due process claims."

69. It is additionally important to remark that *Tennessee v. Lane et al.,* noted the expansive reach of 28 C. F. R. 35.150(a)(1): "Public entities need only ensure that each service, program or activity, . . . when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C. F. R. 35.150(a). The word accessible here shall not be held to the confines of a definition of physical presence, yet defined regarding *Anderson v. Gus Mayer Boston Store*, 924 F. Supp. 763, 771 (E.D. Tex. 1996), "Unlike other legislation designed to settle narrow issues of law, the ADA has a comprehensive reach and should be interpreted with this goal in mind." [emphasis added]

70. Numerous witnesses have explained that access to the cour*t*s and other important government buildings and official*s* depended upon their willingness to crawl or be carried. And Congress was told that state officials *themselves* had "pointed to negative attitudes and misconceptions as potent impediments to [their own] barrier removal policies." Advisory Comm'n on Intergovernmental Relations, *Disability Rights Mandates: Federal and State Compliance with Employment Protections and Architectural Barrier Removal* 87 (Apr. 1989). The physical exclusion of people with disabilities from public buildings has special constitutional import when court proceedings are taking place inside. Parties in civil litigation have an analogous Due Process right to be present in the courtroom and to meaningfully participate unless their exclusion furthers important government interests. *See, e.g., Popovich*, 276 F.3d at 813-814 (en banc); Helminski v. Ayerst Labs., 766 F.2d 208, 213 (6th Cir.), cert. denied, 474 U.S. 981 (1985).

71. Perhaps most importantly for this honorable Court to take Judicial Notice of is the very recent Massachusetts Supreme Court Case of *In re: Ruby McDonough*, 457 Mass. 512. 2010. Argued by lawyer Wendy Murphy, this has been a landmark case within this State and ADA

movement as it was the first to point out that mere *physical* access to the Court does not equal

access. Disabled litigants have a right to *testimonial* and *participatory* access. *Id.*

72. This case also gives the reasonableness of said accommodations request as well as their

necessity. It is to ensure that "full and equal" opportunity to participate in this matter (or any

other matter on that note). Without these accommodations participation will be impaired due to

symptoms related to said disability. This is conflicting with the obligation of the Court not to

discriminate. See 42 U.S.C. § 12132. Additionally, *McDonough* shows us to alert the Judge and

adverse party that the litigant needs accommodations but only as far as to identify the

accommodations only, not the disability itself. Finally, if the accommodations are not provided

or the reasonableness of said accommodations challenged, there must be a hearing based on

*McDonough.*

73. Additionally, this is in opposition to the Courts duty to affirmatively provide

accommodations as relevant ADA regulations specifically impose on public entities a mandatory

stipulation to provide appropriate accommodations, such as auxiliary aids and services, where

necessary to afford an individual with a disability an equal opportunity to participate in litigation.

Their rights to enjoy the "same benefit, or to reach the same level of achievement as that

provided to others". 28 C.F.R. § 35.130(b)(1), (ii and iii).

74. Furthermore, although a requested accommodation may be deemed "unreasonable" if

too costly and/or if the request interferes with constitutional rights, it is important to note that the

options proposed here are all cost-free or inexpensive enough that granting them in this matter is

clearly reasonable. While the opposition may argue that other accommodations will suffice, a

Judge is obligated "to give primary consideration to the accommodation requested" by the

individual with a disability. Cf. 28 C.F.R. § 35.160(b)(2) (2009) (under the ADA, "[i]n

determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities").

75.   As an Attorney General pointed out, every court house in has an "ADA coordinator," but the role of such ADA coordinators as it might apply to the circumstances presented in this case is far from clear. Policies and guidelines that apply to requests for accommodations by various persons, including witnesses, have been promulgated by State courts in other jurisdictions. See, e.g., Rule 1.100 of the California Rules of Court ("Requests for accommodations by persons with disabilities"); Colorado Judicial Department, Access to the Courts: A Resource Guide to Providing Reasonable Accommodations for People with Disabilities for Judicial Officers, Probation and Court Staff; Georgia Commission on Access and Fairness in the Courts, A Meaningful Opportunity to Participate: A Handbook for Georgia Court Officials on Courtroom Accessibility for Individuals with Disabilities (2004); State Court Administrative Office of Michigan, Model Policy: Requests for Accommodations by Persons with Disabilities (1998).

76.   There may be circumstances where a judge becomes aware that a witness is disabled and requires accommodation because the disability and need for accommodation are "obvious." In such cases, lack of a specific request from the witness or proffering party should not bar the judge from fulfilling the court's obligation to provide "reasonable accommodation," if available. *Boston Hous. Auth. v. Bridgewaters*, 452 Mass. 833, 845-848, 898 N.E.2d 848 (2009) (housing authority had notice of tenant's disability despite lack of express notice from tenant, and although tenant did not request accommodation expressly, tenant's acts and assertions "amounted to a request for an accommodation"; "[t]o make a reasonable accommodation request, no 'magic' words are required"); *Robertson v. Las Animas County Sheriff's Dep't*, 500 F.3d 1185, 1197

(10th Cir.2007), and cases cited (when need of individual with disability for accommodation is "obvious," individual's "failure to expressly 'request' " accommodation is "not fatal" to ADA claim).

77.   The proper method for providing such notice, and the proper response to requests for accommodations, will vary depending on the role of the person making the request (e.g., litigant, witness, juror) and the type of accommodation requested (wheelchair access, sign language interpreter). Cf. 28 C.F.R. § 35.106 (2009) (under ADA, "public entity shall make available to participants and other interested persons information regarding the provisions of this part and its applicability to the services, programs, or activities of the public entity"). Plaintiff was not made aware of her rights under the ADA as mandated.

78.   28 C.F.R. 35.106 (2009) states that an Administrative office of a Court, more specifically the Administrator, has duty to provide rights under ADA. As found in *Badillo-Santiago v. Naveira-Merly,* 378 F.3d 1 (1st Cir. July 29, 2004) Judges do not enjoy absolute immunity for acts that are administrative rather than judicial in nature.

79.   As organizations operating public facilities of all types have prepared to comply with the ADAAA after its effective date of January 1, 2009, they have been forced to keep in mind that a much lower standard will be applied to determine who qualifies as "substantially limited" in a major life activity, and thus which persons are protected as disabled. The focus of ADAAA cases has moved away from arguments over whether an individual is disabled and thus protected by the ADA, to the question of whether the organization operating a public facility has discriminated against the individual. While the standard set forth in the ADAAA's legislative history may not be the standard ultimately adopted by the EEOC, it currently provides the best (and only) currently available guidance as to what the standard might be.

80.   The operative question is not whether Title II is broad, but whether it is broader than necessary. It is not. The history of unconstitutional treatment and the risk of future discrimination found by Congress pertained to all aspects of governmental operations. Only a comprehensive effort to integrate persons with disabilities would end the cycle of isolation, segregation, and second-class citizenship, and deter further discrimination.

81.   But here there are findings reflecting Congress's determination that States engaged in forms of discrimination that can rise to the level of unconstitutional conduct: "outright intentional exclusion...failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria segregation, and relegation to lesser services." 42 U.S.C. 12101(a)(5).

82.   **42 U.S.C. §§ 12103** prohibits against retaliation and coercion against disabilities. For example April 2008 Plaintiff explained by Order to Show Cause to Judge Mary Smith that she was unable to timely address Defendants Jones, Garneau and Blake's of Jones Sledzik Garneau & Nardone's countersuit. Plaintiff's disabilities provided a reasonable excuse for the inability to timely answer said opposition. Judge Smith ignored the pleas and granted the aforementioned Defendants' a default judgment.

83.   Former Administrative Judge Francis Nicolai, Judge Martin, Judge Connolly, Judge Mary Smith, Administrative Judge Alan Scheinkman, and ASCJ Neary **are not Immune from Suit.** Given the abrogation of state **immunity** by the **ADA**, claims can be brought against a state judge in his/her individual or official capacity under the **ADA** but for the doctrine of **judicial immunity**. It has been established that this doctrine generally affords judges **immunity** from damage suits.  See *Stump v. Sparkman*, 435 U.S. 349, 356 (1978).  However, the Supreme Court has held that judges can be held liable for damages in suits where actions, which are

administrative in nature, are challenged. *See Forrester v. White*, 484 U.S. 219, 224-225 (1988). The Court in *Forrester* refused to attach **judicial immunity** to a judge's decision to fire a court employee, because the act was not **judicial** in nature. The Court held that truly **judicial** acts must be distinguished from the administrative, legislative or executive functions that judges may occasionally be assigned to perform. According to the Court, it is the nature of the function performed -- adjudication -- rather than the identity of the actor who performed it -- a judge -- that determines whether absolute **immunity** attaches to the act. Any time an action taken by a judge is not an adjudication between parties, it is less likely that the act [will be found to be] a **judicial** one. *Cameron v. Seitz*, 38 F.3d 264, 271 (6th Cir. 1994).

84.  New York State has shown judicial usurpation of power and/or a clear abuse of discretion by the rendering of matrimonial related orders and proceedings manifest injustice to Plaintiff's Constitutional and Civil rights. Plaintiff contends this court has Federal question jurisdiction as to whether New York State's procedure used to separate Plaintiff as the biological Mother of her three children complied with Constitutional due-process requirements, *Thomas v. New York City*, 814 F.Supp. 1139, 1147 (E.D.N.Y.).

85.  On September 28, 2004, Montagnino in an alleged referee's report, exhibited fundamental discrimination against Plaintiff based upon her national origin as "Cuban" and non monied status, causing extreme financial hardship and emotional distress. Said discrimination has continued thus far. This further reveals and proves the retaliatory consequences imposed on the Plaintiff for having raised and objected to the improper acts within cases by forcing custodial arrangements and stripping the non-monied spouse of any finances.

86.  In March 2004, Montagnino also evinced bias outside of the court during a Continuing Lawyer's Education course at Pace Law School, by professing prejudicial treatment referred to

as the "10583 syndrome." This is a prejudice against women who Montagnino contends expect more than their entitlement of equitable distribution of a divorce.

87.  Dr. Patricia Singleton, PhD in conjunction with Dr Karin Huffer PhD have both treated the Plaintiff for nearly 10 and 3 years, respectively and are most qualified to address her overall psychological profile. Both concur that as a direct and proximate result of the failure of the ADA Administration of the Westchester County Court to accommodate Plaintiff as a person with disabilities, Dr Huffer states, "[Plaintiff's] Ms. Walter's condition is continuing to deteriorate. The stress of litigation without accommodations is affecting Ms. Walter's condition making this litigation experience more a war of attrition than litigation.  [Plaintiff] Ms. Walter suffers from a psychiatric injury from protracted litigation surrounding being blocked from contact with and protection of her children." PTSD is a normal reaction to an abnormal situation that will heal when the traumas discontinue.

88.  That Plaintiff asks this the Supreme Court to recognize the reports of two *qualified psychologists* that declare her mental fitness is sound and request the resumption of contact with the children immediately as well as the stay on the taking of the marital home.

89.  That the nature and extent of the gross legal abuse over the years and the related litigation have afflicted me with disabilities recognized by ADA and ADAAA. Plaintiff has suffered sleepless nights, loss of concentration, nervousness, post traumatic stress disorder from the legal abuse, memory loss, anxiety, humiliation, physical injury in the form of stomach and nerve sickness, irreparable injury causing fatigue and numbness, undue pressure from extreme financial hardship, prolonged pain and suffering, (pain from her disability was continually aggravated by the denial of disability accommodations to the point where she has not recovered

sufficiently to engage in contested litigation), denial of fundamental rights causing emotional distress and other incidental and consequential damages.

## SECOND COUNT
### (Changing documents and other perjuries)

90.    February 25, 2005, Rose Mary Palladino and Adele Matias, as state actors and employees of the Unified Court System, colluded and acted illegally by conspiring to commit fraud upon the Court with James Montagnino, former court attorney and acting referee in Westchester County Supreme Court by falsely logging official court documents. This is including but not limited to said transcripts herein, thereby furthering the scheme to deny Plaintiff fundamental rights.

91.    Former certified Justice w. Denis Donovan also conspired with James Montagnino, through coercive and collusive actions as supported on record. For example on or about February of 2005, a court document deceptively procured alleging confirmation of the referee's report and intentionally falsifying the record among other related documents.

92.    Greg Salant, Esq of Harold Salant  engaged in misconduct to the courts and others, by wrongfully submitting unsworn documents, made improper submissions of tampered information in violation to Penal law and the rules of evidence. Rendering of misinformation has improperly influenced the children, the court and others. This was with the intent to prejudice Plaintiff's position as a fit parent resulting in violations to Penal Law Art. 210.15, 210.10, 210.45, 195, 135, 240.30, 420, 260.10, 190.42, 190.4, 240.30, and in violation of Rules of the Chief Judge (22 NYCRR 7.2b).

93.    The highest court in New York State declared, "where the public servants have stepped outside the scope of their respective authority and have acted in the clear absence of all jurisdiction or without colorable claim of authority, there is plainly no entitlement to absolute

immunity, even if the underlying acts are prosecutorial or quasi-judicial in nature." *Pietra v. State*, 71 N.Y.2d 792, 530 N.Y.S.2d 510 (1988).

94.   Note, Plaintiff did not have an attorney during the alleged appointment of Dr. Herbert Lessow by Judge La Tia Martin on or around May 16, 2007 who nonetheless issued a report despite the fact that she had a right to properly not participate, accordingly.

95.   John Walter is employed by the Leukemia Lymphoma Society as President and CEO (prior position as Sr. VP) and has engaged in libelous activities, among others, in violation to Plaintiff's rights to privacy, due process and other fundamental rights. John Walter has represented his position as an officer of LLS to intentionally and willfully exert undue influence and rendered false information in order to achieve preconceived outcomes to further hurt and punish the Plaintiff.

96.   Acting Judge Neary exhibited abuse of discretion by identifying Greg Salant as the "relatively the neutral person" inconsistent to the intent of law for appointment of attorney for the children and erroneously adopted Salant's views as the law of the case. John Walter attorney Cohn referred to tampered evidence in support of the legal abduction, all of which, inter alia, denied Plaintiff her due process and equal protection rights and her fundamental parental rights.

97.   Acting Judge Neary in an initial conference evidenced pervasive bias and impartiality with comments like "if there is a will there's a way" of Plaintiff's reasonable attempts for compliance despite her poor economic status and other consequences stemming from the abuse of the legal system. ASCJ Neary continued, "Who was the last ax murderer that you know?" Directed to assigned counsel in response to her effort to cite that children of imprisoned murderers are brought to jail, ASCJ Neary furthered, "If they want to go." Next assigned counsel identified John Walter and his alleged wife as the parents of the children in school directories,

ASCJ Neary stated, " I'm not bothered by that. You may be. It doesn't affect me. …

Unfortunately, I'm the one, I think, you have to impress and that's not impressive." "On the

visitation issue, it's the Court's decision that given Miss Walter's renascences in the past and her

apparent uncooperative nature, the Court is not, at this point…" Acting Judge Neary violated

Judiciary law section 100.3 (E)(1)(a)(i) which requires a judge to disqualify himself when

impartiality might reasonably be questioned, such as where the judge has a personal bias or

prejudice concerning a party.

98.   Acting Judge Neary is an appointed "Acting Supreme Court Judge". An acting Judge is

a quasi-judicial position. The Constitution of the State of New York does not authorize any

quasi-judicial position to conduct any aspects of the judicial function; it only authorizes the

position of an elected judge to perform this function. NYS Constitution Art. VI, § 4, 6, 7. Thus,

the New York State Constitution does not authorize the position of an Acting Supreme Court

Judge and restricts the use of appointed judges. That the State Constitution is very specific as to

the establishments of the Courts in the State, their jurisdiction and who is allowed to preside in

the courts. That the NYS Constitution states in Article VI § 26. "(a) A justice of the supreme

court may perform the duties of office or hold court in any county and may be temporarily

assigned to the Supreme Court in any judicial district or to the court of claims."

99.   While the NYS Constitution permits a "judge of the court of claims may perform the

duties of office or hold court in any county and may be temporarily assigned to the supreme

court in any judicial district" § 6 (a) The state shall be divided into eleven judicial districts. (c)

The justices of the Supreme Court shall be chosen by the electors of the judicial district in which

they are to serve. That since the 1960's provision to the NYS Constitution permitting temporary

assignment of justices from the Court of Claims to "act as Supreme Court Justices" was not

intended and cannot be exercised when it grossly violates the controlling strictures of the Constitution that requires Supreme Court Justices to be duly elected within the judicial district. That Defendant acting Judge Neary was formerly appointed as County Court Judge in 2003 to fill a vacancy and to date has appointed judgeship positions but has no history as a duly elected Judge. That the terms of duly elected justices of the supreme court shall be fourteen years from and including the first day of January next after their election.

100. The improper but creative administrative use of the available temporary assignment machinery is being further unlawfully applied to allow Acting Judge Neary to continue to function as "acting Supreme Court Judge" indefinitely as if a duly elected Supreme Court justice. Moreover, the legal definition for "temporary" should not exceed one year. Acting Judge Neary is serving indefinitely as acting Supreme Court Judge from the Ninth Judicial District to the Tenth and others, which violates the intent of the NYS Constitution with absolute disregard to the popular vote of the constituents within the districts. Notwithstanding that under the austerity measures particularly prevalent in NYS, this accurately phrased "Acting Supreme Court Judge" is earning two salaries exceeding $200,000 and is entitled to two Pensions as concurrent supposed judge is also employed as judge in the NYS Court of Claims.

101. Acting Judge Neary has acted in absence and in excess to jurisdiction and violated Laws and Rules and has denied Plaintiff her rights to due process of law and equal protection by acting under the *color of law*.

102. Disparate treatment and discriminatory practices are often endorsed or tolerated by the State of New York Appellate Divisions and the Court of Appeals, which bodies and actions are replete with conflicts of interest impacting fundamental due process and other rights, all contrary to fundamental United States Constitutional standards rendering necessary immediate injunctive

relief by the Federal Judiciary and immediate appointment of a federal monitor.

## THIRD COUNT
### (Subject Matter Jurisdiction and other abuses of discretion)

103. Lack of subject-matter jurisdiction is a defense that may be raised at any time by either a party or the court. It is never waived by failure to raise it at a particular point in a proceeding. The Judgment of Divorce was procured in the absence of subject-matter jurisdiction, and thereby the Judgment of Divorce by the Westchester County Supreme Court on May 6, 2005 is without subject-matter jurisdiction and is void. A court that acts without subject-matter jurisdiction or in excess of its power produces a result that is void and cannot be enforced.

104. The selection of James Montagnino to be a Special Referee was without legal and proper authority and devoid of subject matter jurisdiction. It was in contravention of New York CPLR Art. 4312 (2) and in violation to the Uniform Rules for N.Y.S. Trial Courts (202.3) Individual Assignment system; structure; "Assignments shall be made by the clerk of the court pursuant to a method of random selection authorized by the Chief Administrator Roles of the Chief's Administrative Judge." *See* also NYCRR 122.6(c) and other law and denied Plaintiff's substantive and procedural rights to due process and equal protection, all of which was permitted and ratified by State defendants and state actors herein.

105. Montagnino had no subject matter jurisdiction nor authority to hear, act, report or determine any of the causes in the Matrimonial action, as no lawful Order of reference was made in writing nor was an order of reference orally directed by a judge in an open court, the Plaintiff was forced to proceed before James Montagnino despite her objections, all of which violated Plaintiff's Due Process and equal protection rights.

106. Justice Donovan improperly entertained said motion for Montagnino's retroactive appointment, which took subject matter jurisdiction from Donovan. He engaged in ex parte

communications with Montagnino and allowed Montagnino to testify, who was not a disinterested expert to ascertain consent for Montagnino's designation as Special Referee by one of the two parties. Donovan's ex parte contact with Montagnino, the very person whose authority was in question and who categorically was not a disinterested party is in violation to Canon 3(A)(4) of the American Bar Association (ABA) Model Code of Judicial Conduct and violates the Fifth Amendment to the Constitution, the right to have personal liberties protected by Due Process of Law.

107. Acting Judge Neary whose Constitutionality for appointment to the matter as appointed Acting Supreme Court Judge within the Westchester County Court is in question, was assigned after have been bounced around among a litany of Judges since the illegal abduction of the children by John Walter and co-conspirators in October 2006.

108. Judge Nicolai has no judicial immunity from the administrative duty to remove special referees. Montagnino was acting as special referee; Plaintiff filed an Order to Show Cause on October 31, 2003 James for Montagnino's removal. Further on November 12, 2003 requested the removal to be referred to Judge Nicolai in her related Reply Affidavit. *See Forrester v. White*, 484 U.S. 219, 224-225 (1988). The Court in Forrester refused to attach **judicial immunity** to a judge's decision to fire a court employee, because the act was not **judicial** in nature. The Court held that truly **judicial** acts must be distinguished from the administrative, legislative or executive functions that judges may occasionally be assigned to perform. According to the Court, it is the nature of the function performed -- adjudication -- rather than the identity of the actor who performed it -- a judge -- that determines whether absolute **immunity** attaches to the act.[6] Any time an action taken by a judge is not an adjudication between parties, it is less likely

that the act [will be found to be] a **judicial** one. *Cameron v. Seitz*, 38 F.3d 264, 271 (6th Cir. 1994).

109.  Moreover, the Appellate Division 2nd department on March 20, 2007, attempting to cure the jurisdictional defect that continues to exist cited CPLR 4212. CPLR 4212 is not only not relevant in this case at bar, but cannot be viewed singularly as the sole authority when it contravenes the controlling statutory authority CPLR 4312(2) and related case law. January 2003, the question of jurisdiction in this contested matrimonial matter has been one of wanting subject matter jurisdiction that fails because CPLR 4312(2) must be complied with as it is essential for the court to first have power for the very appointment of a special referee or Judicial Hearing Officer in a contested matrimonial action.

110.  It is important to note that Special Referee's are typically appointed in financially complex cases. The related matrimonial case was in no way financially complex, as the Plaintiff was a stay at home mother, and John Walter was a W-2 wage earner, making approximately $200,000 annually as Senior Vice President of the Leukemia and Lymphoma Society with nominal assests. Additionally, this matter does not fall under the definition of law for CPLR 4212, but of greater import, that CPLR 4212 unequivocally does not cure the fatal jurisdictional defect because it cannot supersede CPLR 4312(2) requiring leave of court before the Special referee is designated to the contested matrimonial action.

111.  Moreover, the late Carl Stahl's motion for James Montagnino's nun pro tunc order of reference was initially signed by the then Supreme Court Judge Robert Spolzino on April 14, 2004 when it should have never been entertained in the first place as unlawful. Further, the pertinent motion was invalid because former Judge Spolzino's involvement in this matter overlapped his appointment to the Appellate Division 2nd department.

112. On April 24, 2004, illegal ex parte communications occurred amongst James Montagnino and Justice Donovan, resulting in an appearance of impropriety in violation to Judiciary law section 100.3 (E)(1)(a)(i) which requires a judge to disqualify himself when impartiality might reasonably be questioned, such as where the judge has a personal bias or prejudice concerning a party, along with the late Stahl, Neustein and Cohn colluding to perfect the conspiracy and illegal acts against Plaintiff. Former Justice Donovan and former Judge Spolzino, both exhibited abuse of discretion.

113. Judge Donovan was devoid of subject matter jurisdiction to grant John Walter's motion as the court had no power or authority to issue an order to confer subject matter jurisdiction that is prohibitive by statute and case law. The granting of said order of reference is void ab initio. Donovan is not immune for actions, although judicial in nature, taken in complete absence of all jurisdiction, *Mireles vs Waco*, 502 U.S. at 11-12, 112 S.Ct at 288.

114. April 2004, Tammy Neustein , Esqcolluded and acted illegally with other state actors herein by filing a false affidavit, which fraudulently claimed that the Plaintiff had not objected to state actor Montagnino's appointment as Referee. Quite the contrary to facts, Neustein received a copy of Plaintiff's October 31, 2003 Order to Show Cause and related Reply Affidavit. Neustein was a recipient and participant at the related conferences in which Plaintiff made her objections known.

115. In *Morrison v. Lipscomb*, 877 F.2d 463 (6th Cir. 1989), a Chief Judge's moratorium on writs of restitution during two holiday weeks was challenged by a landlord unable to redeem his property from a tenant for those two weeks. The Court of Appeals for the Sixth Circuit held that the moratorium, though performed by a judge, was not a **judicial** act entitled to absolute **immunity**. *Id.* at 466. The court noted that the act was not **judicial** in nature, because the

legislature could have easily issued the moratorium as well. *Id.* The <u>Morrison</u> Court's reasoning has a direct bearing on the above captioned case. The processing of auxiliary aid requests is a function performed by court administrators rather than judges.

116. Judge La Tia Martin abdicated her judicial duty by denying Plaintiff Due process of law to the U.S. Constitution Amendment VI and to the N.Y.S. Constitution Article 1 Section VI. Martin abused her discretion and therefore, denied Plaintiff's rights to her children by extending an emergency order stemming from Family Court back in October 2006. Judges must maintain a high standard of judicial performance with particular emphasis upon conducting litigation with scrupulous fairness and impartiality, 28 USCA § 2411; *Pfizer v. Lord*, 456 F 2d 532; cert denied 92 S Ct 2411; US Ct App MN, (1972). Plaintiff was told in said hearing the children now lived in Scarsdale, NY, but just learned in December of 2010 what the exact address is.

117. J. Martin's abuse of discretion and lack of impartiality is evinced on record by obviating due diligence to ascertain the parameters of the temporary transfer of custody that was initiated in the Family Court was consolidated with the related financial issues by Order to Show Cause in Supreme Court by Supreme Court Judge Anthony Scarpino's order dated February 16, 2007. This case illustrates to what degree the judiciary can rise to obviate the principle of parens patriae. the record shows that this Plaintiff Mother was dedicated to her children's daily needs and that there would not be any findings of permanent neglect.

118. The New York State Commission on Judicial conduct is also provided for by the New York State Constitution in Article VI on the Judiciary in part as follows:

§22. a. "There shall be a commission on judicial conduct. The commission on judicial conduct shall receive, initiate, investigate and hear complaints with respect to the conduct, qualifications, fitness to perform or performance of official duties of any judge or justice of the unified court system, in the manner provided by law; and, in accordance with subdivision d of this section, may determine that a judge or justice be admonished, censured or removed from office for cause,

including, but not limited to, misconduct in office, persistent failure to perform his or her duties, habitual intemperance, and conduct, on or off the bench, prejudicial to the administration of justice, or that a judge or justice be retired for mental or physical disability preventing the proper performance of his or her judicial duties. The commission shall transmit such determination to the chief judge of the court of appeals who shall cause written notice of such determination to be given to the judge or justice involved. Such judge or justice may either accept the commission's determination or make written request to the chief judge, within thirty days after receipt of such notice, for a review of such determination by the court of appeals." See, http://www.dos.state.ny.us/info/constitution.htm.

119. Upon information in April 2008, state actor Judge Nicolai and others intervened in a related but distinct Index # 15496/03 civil action filed by Bender and Bender, Jenson & Silverstein, LLP (hereinafter Defendant BJS). Plaintiff's former divorce attorneys allege uncollected legal fees, Plaintiff countersued. Lawsuits were consolidated in August 2005 and a trial was pending before Westchester County Supreme Court Judge Orazio Bellantoni. On the eve of trial, Nicolai intervened the case, and ruled on Bender's motion in limine requiring Plaintiff to turn over original documents of discoverable demands to Judge Nicolai in court within a 20-day timeframe, or confront absolute preclusion to submit any documents as evidence at trial.

120. Peter Ackerman represents Defendant BJS. Judge Nicolai and others also intervened in the lawsuit brought on by BJS by permitting subpoenas for documents and other information from Plaintiff's other former matrimonial attorney Jones, and from the spouse, John Walter and his attorney, the late Stahl who is now replaced by Cohn.

121. During June and July 2008 court records were being destroyed and Plaintiff was fearful and intimidated by Nicolai's unlawful order to transport originals to the court. Montagnino testified on June 8, 2009 at a public hearing before the NYS Senate on "Corruption in the Judiciary" led by NYS John Sampson, "In Westchester County, I filed a complaint ultimately with the Commission on Judicial Conduct that was detailed. I named names, I gave cases, I gave

dates. Attached to it were photographs of dumpsters, dumpsters of court records that were ordered destroyed. Matrimonial files by law must be retained permanently. They were destroyed." "I filed a complaint against the same administrative judge, Judge Francis Nicolai." (Judge Nicolai).

122.  However, intrinsic to the stratified web of deceit and corruption belies the fact that James Montagnino on behalf of Fred L. Shapiro, testified in the aforementioned public hearing of the very corruption they actively participated within the Matrimonial Part against their superior at the time, the former Administrative Judge of the Ninth Judicial District, Nicolai. This disparate position is likely at the center of a politically sensitive investigation arising from varied reports of collusive references and conspiratorial connections with high-powered attorneys and monied spouses designed to gain tactical advantage into electoral platforms for a slate to the Supreme Court judgeship and commit other material improprieties. Ironically, the aforementioned testimony underscores deep contradictions at the heart of the threshold issues of public corruption in the NYS judiciary that egregiously harmed non monied spouses, mostly Mothers like the Plaintiff and the children and families. Of public concern is the simultaneous demand that Montagnino, former Acting Judge Shapiro, former Appellate Judge Spolzino, retired Judge Donovan, Judge Martin, and retired Judge Edlitz and others root out the corruption that pervaded their wrongful actions while under the alleged authority to the very leaders suspected of perpetrating it. These leaders may include but are not limited to Judge Nicolai, Judge Jonathon Lippman and more, all of which illegally the New York State Matrimonial and Unified Court system as a whole rendering federal injunctive relief and a federal monitoring and other relief appropriate.

123. Allegations of widespread improper "judicial steering", ex parte contacts, favors for connected attorneys and more within the Westchester County Matrimonial Part were so pervasive that a NY Law Journal article dated June 26, 2006 by Daniel Wise emerged discussing Judge Francis Nicolai and court attorney and sometimes Special Referee, Montagnino, as well as others. See, http://integrityinthecourts.wordpress.com/2007/06/21/judicial-steering-in-new-york-courts/.

124. More importantly, James Montagnino testified on June 8, 2009 about the existence of retaliation that occurs against individuals that bring complaints. "Attorney" Montagnino testified in his own case that he "brought an internal complaint to various chief administrative judges of the Office of Court Administration, and the result of that was retaliation against me". See, above, Page 203, Lines 11-16, Senate Hearing on the Courts, June 8, 2009, Link at page bottom, http://www.frankbrady.org/TammanyHall/Documents.html. "It would have been one thing if I had been the only complainant, Senator. But a retired acting justice of the Supreme Court, Fred L. Shapiro, sent his own complaint to the Commission on Judicial Conduct against the same administrative judge, Judge Francis Nicolai, alleging the same kinds of abuses –naming names, giving dates, giving information that he had personally obtained." The principal law clerk to a Supreme Court justice in the Ninth Judicial District, Barry Skwiersky, sent his own complaint to the Commission on Judicial Conduct, with his information on routine, regular, consistent patterns of misconduct whereby Judge Nicolai would steer cases.

125. The retaliation toward the Plaintiff by these parties cannot be understated.

126. The Westchester Guardian, July 3, 2008, published an article "Westchester Courthouse Exposed" written by James Montagnino, featured as "Judge Candidate's Startling Allegations about Westchester Courthouse". Montagnino outright concedes to the fraudulent acts occurring

at the aforementioned court by stating, "Litigants with the right connections were able to get cases transferred away from judges who didn't see things their way. On more than one occasion, a judge was even directed to change rulings that he had made because one of the parties had secretly contacted that judge's superior to ask for a favor."

127. The allegations herein of Judges, attorneys and others working as public employees in the New York State court system rises to the level of a RICO action.

128. Judge Martin, Judge Edlitz, Judge Connolly and Judge Neary exhibited abuse of discretion, did not act in good faith, and knew or should have known of the constitutionally volatile effect of their actions. They should have been reasonably expected to know what they were doing, *Harlow et al vs Fitzgerald* 102, S.Ct 2727, 457, U.S.800 (U.S. 6/24/1982.) That these were not just ordinary employees of the State, but were individuals who possess the responsibility to administer justice and protect the Constitutional Rights of the citizens of New York. In addition to their educational and professional experiences and their obligation to their Oaths of office, Plaintiff specifically and repeatedly notified them to protect her Constitutional and Civil rights.

129. The acts that led to the severing of the Mother/Child relationship constitute cruel and unusual punishment, which is forbidden by the Eighth Amendment to the Constitution.

## FOURTH COUNT
### (Conflicts of Interest)

130. December 5, 2006, Plaintiff was still in Family Court and raised the issue to former Judge Edlitz that material conflict of interests existed and had continued to be allowed to exist between Salant (Counsel of the three children), and Abrams, whom both worked for Harold, Salant, Strassfield & Spielberg. October 2006. Salant could not function as independent counsel

for the children as there was access to personal and confidential information pertaining to the underlying matrimonial matter and to the children previously.

131. Plaintiff's consultations with Abrams in 2001 regarding family matters established an attorney-client relationship. Abrams rendered legal advice based on that confidential information that Plaintiff relied and executed upon. Said legal advice resulted in the transfer of funds into a personal, not joint account. John Walter, Stahl, Shapiro, Montagnino, Donovan and others used this to make erroneous accusations of financial misconduct and wasteful dissipation of marital assets in the alleged Judgment of Divorce in May 2005. Abrams involvement was well documented on record and for the court to allow the conflict of interest to exist denies Plaintiff due process of law and equal protection.

132. Material conflicts of interests also existed amongst the late Stahl, and Cohn, Salant, John Walter and others.

133. The (late) Stahl and Salant had prior undisclosed personal relationships that materially affected Plaintiff's fundamental rights. On December 5, 2006, Salant committed perjury having stated to Judge Edlitz of Family Court that he was not a partner when in fact he was a partner in the law firm of Harold Salant, Strassfield & Spielberg, This relationship as a partner was a material factor to determine whether a conflict of interest existed with Abrams. Salant's testimony was inconsistent with his Law firm's (HSSS) website which clearly advertised that (Gregory) Salant and his father Jeffrey Salant were both partners as a father son legal team. In violation to the Code of Professional Responsibility, Salant Jr. acted inconsistent to The Association of the Bar of the State of New York.

134. The Committee on Professional and Judicial Ethics states in Formal Opinion No. 2006-02, that a lawyer who participates in a "beauty contest" with a prospective client but who

43

ultimately is not retained by the prospective client, is personally prohibited from later representing a client with materially adverse interests in a substantially related matter. Salant, HSSS and Abrams engaged in obstruction of justice and fraud upon the court, all of which was permitted and ratified by state actors herein.

135.  Salant committed perjury on September 27, 2007, by stating on record before Judge Martin that Popper, as the child therapist, was not treating the children. Judge Martin's Order dated June 25, 2007, stated the law guardian (Salant) reported Popper was treating the children. Salant further violated the Plaintiff's rights under HIPAA and others on September 27, 2007, as Popper had also treated the Plaintiff in prior years. This is supported by insurance claims processed by Aetna health insurance records.

136.  December 3, 2003, the first date of trial on finances of the matrimonial action, Plaintiff's rights to a full and fair opportunity to be heard in a competent court was denied. Plaintiff appeared in court self represented having been denied funds to retain an attorney. Montagnino and the late Stahl acted in concert with attorney Jones sitting in the back of the court to coerce the retention of Jones Esq as private counsel for Plaintiff. In court, Montagnino revealed he had engaged in prior ex parte communications with Jones relevant to Plaintiff's case without her knowledge or authority. Montagnino and Stahl conspired for Plaintiff to retain Jones while pro se in court. She was forced against her free will. Montagnino denied Plaintiff's requests for an attorney chosen at free will per CPLR 321

137.  February 4, 2004, Jones Esq wrote a letter regarding a February 2 conference held only with James Montagnino and the attorneys Cohn, Jones and the late Stahl. Montagnino stated "[e]xplicitly that applying his discretionary authority, he would not accept a settlement and sign a Judgment of Divorce that included a term providing [Plaintiff] [Margarita T. Walter] have

"final say" regarding the children". Such denial of was not even on deck for January 29, 2004, it was a trial on finances. Jones refused to raise issues of subject matter jurisdiction as well as other issues, obviously not zealously representing his "client".

138.  At the conclusion of the trials, Jones, Blake, and their firm, charged Plaintiff nearly $80,000 for "unauthorized" legal fees, which were assigned to the Plaintiff in said divorce judgment. Jones, Blake and Jones Garneau did not bill for over 120 days, and later had a lien placed on the marital home in June 2009. The fraudulent billing, as it was sent to the Plaintiff via the United States Postal Service constitutes Mail Fraud. These claims are currently still in disputed litigation, **causing the forced sale of the marital home**.

139.  Bork, an 18B attorney in Family Court on October 31, 2006, acted as Plaintiff's assigned counsel despite material conflicts of interest. He has a personal relationship with Shapiro and Montagnino and was later relieved due to the conflict. On November 20, 2006, Plaintiff submitted a letter to Judge Edlitz, and notified the court of the personal relationship between Bork Esq and Shapiro and of the conflict of influence of their ties to the legal matter at hand, explaining the that Bork Esq must be relieved as counsel as ineffective and not independent and that her continued representation was contrary to the fundamental interests of Plaintiff.

140.  This court is aware of the pattern and practice of certain attorneys working in concert with certain judges, referees, court appointments and others, all of which included preconceived agendas. For example, Plaintiff holds knowledge of a prior forensic report prepared by Allison Bell and who corroborated with law guardian Tammy Neustein both appointed by former Acting Supreme Court Judge Fred Shapiro (hereinafter ACJS Shapiro) who had <u>material undisclosed</u>

conflict of interest as J. Shapiro's nomination committee for Supreme Court judgeship was being

handled by Jules Cohn of Sweeney *et al* (John Walter's co counsel) and with Carl Stahl.

141.  For example, Shapiro's election campaign to run for Supreme Court Judge was handled

by the late Stahl and Cohn of Sweeney, Cohn, Stahl, Spector, & Frank.

## FIFTH COUNT
### (Fraud upon the Court)

142.  October 17, 2006 (by ex parte petition) and at brief appearances on October 26 and

October 31, 2006 in front of Judge Edlitz in Family Court, John Walter, the late Stahl and others

presented false evidence that the Plaintiff was incapacitated and had been so for an extended

timeframe.

143.  This was done a few days after Judge La Cava in Supreme Court had Ordered John

Walter to maintain the marital residence where the three children resided by continuing to pay

the mortgages with the Plaintiff's maintenance. Confusingly, in said hearing, Stahl and Walter

stated the Plaintiff could be gainfully employed in conjunction to caring for the daily needs of

the children and the household. In fact, they showed Plaintiff's capability to care and manage all

of the children's school, health and all other extracurricular activities. Judge La Cava was aware

of the Plaintiff's medical conditions and of the children's special needs and endorsed the

opposition's contention that Plaintiff was fully capacitated to address the children's ongoing

needs on a daily basis. Family Court jurisdiction is limited to in accordance to the pertinent rules

§ 13 (a): "The family court of the state of New York is hereby established the custody of

minors except for custody incidental to actions and proceedings for marital separation, divorce,

annulment of marriage and dissolution of marriage".

144.  Judge La Cava's ruling was October 10, 2006. John Walter removed the children on

October 14, and then filed his emergency ex parte motion October 17. The manufactured

information created an illusory situation: Plaintiff was incapacitated and had been wholly unfit

for an extended period of time. Plaintiff contends that she was not incapacitated; she is a disabled

individual and was following medical treatment for such. The opposition, her monied spouse,

John Walter whom is more than familiar with the Plaintiff's disabilities, successfully committed

fraud upon the court and obstruction of justice: Judge Edlitz granted a stay away order on

October 31. 2006 and is still in effect de facto without due process and equal protection.

145. **The Plaintiff has not seen the three children since or even been allowed to speak to**
**them in nearly (5) years now.** This is a direct violation of the Constitutional right to parent. No

evidentiary hearing was conducted to lawfully modify an alleged joint legal

custodianship between Plaintiff and John Walter as purportedly stipulated on October 1, 2003.

The Supreme Court of the U.S. has supported the prerequisite for the natural parent to have due

process whenever the fundamental rights of that parent to have a relationship with her children is

interfered with or is to be terminated.

146. October 19, 2006, (late) Stahl, (now Cohn) and John Walter also filed an Order to

Show Cause in Supreme Court, stating that Family Court had no jurisdiction on to modify a

Judgment of Divorce on custody after the petitions filed by John Walter and Plaintiff were

dismissed by Judge Edlitz on October 31, 2006. They went on to show Supreme Court had

original jurisdiction over the custody and financial issues of the divorce. October 31, 2006, Judge

Edlitz's infinite "stay away order," and temporary transfer of physical custodianship to John

Walter is unconstitutional and has no legal effect despite the fact that it was transferred to the

Supreme Court in February 16, 2007. Said Order is still fully in effect.

147. September 27, 2007 at a court appearance before Judge Martin, Plaintiff learned that

John Walter had unlawfully and without authorization relocated the children from a school

system they had been registered to their entire lives without Plaintiff's knowledge despite the fact that sole custody was never awarded to John Walter. That Plaintiff states to Judge Martin as indicated on pg 23 of September 27, 2007 transcript, "Your Honor, to the best of my understanding, while illegitimate, there's been a transfer of temporary custody—physical custody to the best of my understanding. My children no longer are enrolled in the -- school district as of the end of June and I would like to understand where they are going to school and where they are living." Plaintiff stated," I'm entitled to have joint legal custody. No one has changed that. Physical custody is erroneously or has been erroneously given to the Father, however, I am entitled to know where my children are going to school."

148.  Judge Martin responds, "Temporary custody was awarded to the defendant father by Family Court." On page 24 in the September 27, 2007 transcript Plaintiff states, "and it is physical custody." The late Stahl states, "No such limitation. The court order does not limit it to physical custody. It says temporary custody has been awarded to the father."

149.  Greg Salant gave numerous substantive false statements to the court, without former Judge Edlitz knowing the nature of extent of the material misrepresentation shows the abuse of discretion. Douglas J. Besharov's notes in his McKinney's Practice Commentary on Family Court Act Section 241 that "the law guardian is also bound by the Code of Professional Responsibilities' prohibitions and restrictions."

150.  Perpetrating fraud upon the Court has been defined by the 7th Circuit Court of Appeals to "embrace that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Kenner v. C.I.R.*, 387 F.3d 689 (1968); 7 Moore's Federal Practice, 2d ed., p. 512, ¶ 60.23,

151. Some of the facts that demonstrate the fraud upon the court and discrimination within the operation of the Unified Court System of New York State were outlined in an Affidavit Plaintiff filed as self represented in October 31, 2003. The Plaintiff, a "non-monied" spouse was intentionally defrauded by Montagnino, the late Stahl, John Walter and Neustein to accept a coerced Stipulation on custody on October 1, 2003, that she said she did not agree with. Her response resulted in veiled threats by Montagnino, stating the Plaintiff would lose custody of the children if she decided to go to trial, and she faced <u>not</u> having an attorney to represent her at the time.

152. (Late) Stahl, Cohn, Neustein and others engaged in ongoing improprieties among including but is not limited to perjury and more and that Bell produced a forensic report that impeded neutrality and was tainted by inclusion of materially falsified information obtained from George Popper, PhD. Popper took about a year to submit the corrections about the children and Plaintiff, presenting the corrections by report to James Montagnino.

153. (Late) Stahl, Cohn, Neustein, and John Walter's collusive appointment of James Montagnino gave rise to alleged proceedings, orders and other acts that constitute gross fraud upon the court, acts abrogated by law. In *Bulloch v. United States*, 763 F.2d 1115, 1121 (10th Cir. 1985), the court stated, "Fraud upon the court is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury. ... It is where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function --- thus where the impartial functions of the court have been directly corrupted." Montagnino's involvement as purported Special Referee in January 22, 2003 orchestrated by the late Stahl and the late Silverstein, attempted to have the parties confer jurisdiction, which clearly, simultaneously was a fatal jurisdictional

defect that could not be cured by Justice Donovan's memorialized order that purports to retrospectively provide authority by a nun pro tunc order of reference.

154. John Walter then (according to Aetna employees and legal department) provided a fraudulent "court order" in which completely denies the Plaintiff any and all access to her children's medical records. This was brought to the attention of acting Judge Neary but was again ignored and denied redress.

155. Salant, Cohn (and formerly Stahl), John Walter and others have orchestrated a pervasive fraud upon the court by presenting to third parties and others including but not limited to Wells Fargo Home Mortgage, to the Scarsdale public school system, and to Federal Judge John Keenan an improper ex parte communication by letter dated October 27, 2010 from Skadden, Arps, Slate, Meagher & Flom, LLP, 0542 (John Walter and LLS lawyers captioned as Defendants in another Federal suit, 11 CV 0542), and others with erroneous information which includes falsified court order(s) and more. This was all done with a preconceived agenda to usurp the Plaintiff's parental rights, preclude her from the health and school records of her children and alienate her from the children. Now they are forcing the sale of the marital residence, and to permit Cohn & Spector to purportedly be authorized to handle the potential foreclosure and/or sale of the marital residence.

156. Skadden violated Plaintiff's rights and committed invasion of privacy by making other erroneous references also violating HIPAA Laws that pertain to personal health issues. Their unilateral, wrongful conclusions have negatively affected the matrimonial and family matters and rise to the level of slander and libel intended to defame and character assassinate the Plaintiff in the eyes of the Court and other professionals.

157. Said letter, written by Daniel L. Kurtz, a partner at the law firm, requested the Honorable John Keenan to keep the letter confidential. Thus exerting undue influence with an ex parte communication strongly conveying it not be provided to Kris Sergentakis, a party in another unrelated litigation who has created a website and was appearing before Judge John Keenan on matters involving John Walter and the Leukemia and Lymphoma Society on separate legal issues. That Skadden exceeded any potential attorney court privilege of protected speech that pertains to their reference of Plaintiff including information that "John Walter is involved in a contentious divorce and was awarded sole custody of his children after it was determined that the ex-Mrs. Walter was not a suitable parent..." Skadden deliberately misinformed the Court of these of falsities, with no trial ever taking place on this matter.

158. That subsequently, Plaintiff's recalcitrant to trust quasi judicial officers and other attorneys is due to the material conflicts of interest she has encountered with attorneys Sweeney etal, Cohn , the late Stahl , Neustein, Bork and others working in concert with Bell and Shapiro and attorneys Bender, the late Silverstein, Jones, Castrataro working in concert with James Montagnino colluding with other State Actors perpetrating many frauds and misrepresentations to the Plaintiff and the Court.

## CONCLUSIONS

159. The three children were taken from the Plaintiff nearly five years ago by an illegally obtained ex parte order by Judge Edlitz dated October 31, 2006. This constitutes fraud, coercion, collusion, and using the legal system as a weapon. John Walter, the late Stahl, Cohn and others were contributory to the emotional affliction stemming from the abuse of the legal process, fraud upon the court and obstruction of justice.

160. Judge Martin furthered the schemes and discrimination herein on a continuing basis by

extending a wrongful order dated October 31, 2006, as if the law of the case, transferred from Family Court Judge Edlitz to Westchester County Supreme Court, said "temporary" based on unethical, illegal, retaliatory, collusive and conspiratorial activities by John Walter, Salant, the late Stahl, Cohn, that remains in effect today.

161. Further, the preclusion to the children and infinite stay away order were done without any view on the totality of the circumstances. This would include the extensive evidentiary hearings just a few days prior: October 10, 2006 by Supreme Court Judge La Cava that favored the Plaintiff as primary custodian of her three natural children, and to remain in the marital residence with the children as they always had.

162. Family Court issued an order that allowed John Walter and others to legally abduct the children stemming as aforementioned merely four days after a ruling was ultimately rendered by Westchester County Supreme Court Judge John La Cava on October 10, 2006 after extensive evidentiary hearings and related motion practice from April 2006 through September 2006.

163. Objections to various Orders, rulings, reports, appointments, and others were properly raised in Court. Additionally, if exception was not correctly taken, the Plain Error Exception would apply in this case at hand. **As the violations are so obvious that a higher Court has a duty to step in and rectify the situation.**

164. Pleadings are to be considered without regard to technicalities. *Pro Se*, pleadings are not to be held to the same high standards of perfection as practicing lawyers. *See Haines v. Kerner*, 92 Sct 594; also See *Power*, 914 F2d 1459 (11th Cir1990); also *See Hulsey v. Ownes*, 63 F3d 354 (5th Cir 1995). Finally *See In Re: HALL v. BELLMON*, 935 F.2d 1106 (10th Cir. 1991).

165. In *Puckett v. Cox*, it was held that a pro-se pleading requires less stringent reading than one drafted by a lawyer (456 F2d 233 (1972 Sixth Circuit USCA). Justice Black in *Conley v.*

*Gibson*, 355 U.S. 41 at 48 (1957) "The Federal Rules rejects the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits. According to Rule 8(f) FRCP and the State Court rule which holds that all pleadings shall be construed to do substantial justice."

166.  There is legal sufficiency to show Plaintiff is entitled to relief under her Amended Complaint. *A Complaint should not be dismissed for failure to state a claim* unless it appears beyond a doubt that the Petitioner can prove no set of facts in support of his claim, which would entitle him to relief. See *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) also *Neitzke v. Williams*, 109 S. Ct. 1827, 1832 (1989). Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations. In applying the Conley standard, the Court will "accept the truth of the well-pleaded factual allegations of the Complaint."

167.  Plaintiff has lost her children, lifestyle, lost trust in the legal system, lost trust in professionals, is economically devastated, and is ill. She awaits restoration and rebalancing after the assault. That is why she turned to the Court of law. Instead, the process depended upon for that restoration has caused cumulative losses and further injury.

168.  All the Plaintiff has asked for throughout this instant litigation is to have a fair and equitable playing field with her accommodations in place and her status as a qualified litigant to be upheld so that she could have been properly functioning cognitively to properly litigate.

## **RELIEF REQUESTED**

WHEREFORE, based upon all the allegations herein, the Plaintiff, Margarita T. Walters prays this Honorable Court to:

A. Grant an immediate Order of injunctive relief restraining the State of New York, Unified Court system of the State of New York and State Office of Court Administration herein from making any further decisions, including the transfer of property, foreclosure of said property, and any and all other decisions surrounding the property until an evidentiary hearing can again be held due to contradicting rulings from two different NY State Courts on the same issues less than one week apart from each other;

B. To contact the minor children and begin therapeutic reintegration therapy due to contradicting rulings from two different NY State Courts on the same issues less than one week apart from each other;

C. Injunctive relief in the form of requested ADAAA accommodations and related qualified status as irreparable harm has occurred in proceeding with hearings, orders and other appearances in the Westchester County Court System with no participatory or testimonial access per ADAAA case law;

D. Request this Court refer these matters to the appropriate United States Attorney, or other investigative and/or law enforcement or oversight agencies as is appropriate by law;

E. As well as any and all other relief it sees just and fit.

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that she is the plaintiff in the above action, that she has read the above Complaint and that the information in the complaint is true to the best of her own knowledge, except as to those matters stated upon information and belief and as to those matters, Plaintiff believes them to be true and correct; 28 USC § 1746; 18 USC §162.

Respectfully Submitted By:

Margarita Z. Walter, Plaintiff in *Proper Person*

Date: July 6, 2011